# Phyllis J. Dragonas *vs.* School Committee of Melrose & others.[1]

No. 04-P-98.

Middlesex. March 3, 2005. - September 6, 2005.

Present: Lenk, Kafker, & Katzmann, JJ.

*Practice, Civil,* Summary judgment. *Libel and Slander. Anti-Discrimination Law,* Age, Employment, Prima facie case. *Employment,* Discrimination.

A Superior Court judge improperly granted summary judgment in favor of the defendants (a school committee, a school superintendent, and a school principal) on a teacher's claim of defamation, arising out of certain statements made by the principal, where genuine issues of material fact existed regarding whether the allegedly defamatory statements were false, and whether the conditional privilege of the principal to make such statements was abused due to malice [437-440]; likewise, a trial was warranted on the teacher's claim of age discrimination under G. L. c. 151B, § 4(1C), where a fact finder could determine that the principal's proffered assessment of the teacher's performance was false and not a good faith judgment [440-445].

Civil action commenced in the Superior Court Department on November 9, 2001.

The case was heard by *Nonnie S. Burnes,* J., on a motion for summary judgment.

*Alice Olsen Mann* for the plaintiff.

*Mary Jo Hollender* for the defendants.

Kafker, J. Phyllis Dragonas, a foreign languages teacher, brought this action against the school committee of Melrose; Charles Martin, former superintendent of the Melrose public schools; and Daniel Burke, principal of Melrose High School, alleging defamation and age discrimination. She claimed that Burke defamed her when he made derogatory comments about her at a meeting with parents concerning an overseas trip to be

---

[1]Daniel Burke and Charles Martin.

chaperoned by Dragonas. She also claimed age discrimination arising out of the failure to reappoint her as the lead foreign languages teacher in the school system. A Superior Court judge allowed the defendants' motion for summary judgment. We reverse.

*Background.* Because this is an appeal from a summary judgment decision, we view the evidence in a light most favorable to the plaintiff as the nonmoving party. *Dattoli* v. *Hale Hosp.*, 400 Mass. 175, 178 (1987). Dragonas, who was born on November 26, 1930, has been employed as a foreign languages teacher in the Melrose school system since 1971. In addition to teaching Spanish and French, she served in various administrative roles during this time.[2] In the summer of 1998, she was appointed lead teacher of foreign languages for the 1998-1999 school year. Lead teacher was a one-year stipendiary position that required appointment by the high school principal and approval by the superintendent. Lead teachers were responsible for teaching four classes daily and performing various administrative tasks on behalf of the foreign languages department.[3]

In addition to her teaching and administrative duties, Dragonas served as the coordinator of the German-American Partnership Program (GAPP), a student exchange program that she cofounded in 1975. In this program, German students would visit Melrose every other fall to study; Dragonas would chaperone Melrose students in Hamburg, Germany, for a month-long stay the following spring.

Burke assumed the position of principal of Melrose High School in July, 1999, and, shortly thereafter, reappointed Dragonas as lead teacher for the 1999-2000 school year, which Martin approved.[4]

---

[2]Director of foreign languages for the Melrose public schools (1971-1981), head teacher of foreign languages at Melrose High School (1981-1991), and curriculum coordinator of foreign languages for the Melrose public schools (1991-1998).

[3]During the 1999-2000 school year, all lead teachers were also assigned a fifth class, called "Focus," which was designed to prepare students for the Massachusetts Comprehensive Assessment System (MCAS) examination.

[4]Burke reappointed three of the five incumbent lead teachers (science,

Burke met with Dragonas on December 3 and 22, 1999, to discuss his concerns about her ability to oversee the upcoming GAPP trip to Germany from April 12 to May 12, 2000. Burke stated in his affidavit and deposition that his concern arose from the following: (1) foreign language department and GAPP budgeting issues; (2) problems with two German students' home placements during their stay in Melrose in October, 1999; (3) Dragonas's attendance in Focus classes in October, 1999; (4) difficulties that tenth grade students traveling to Germany might have with the Massachusetts Comprehensive Assessment System (MCAS) examination upon their return in May, 2000; (5) her fluency and familiarity with German studies compared with those of a German language teacher[5]; and (6) a report he received from two parents that, on a prior GAPP trip to Germany, Dragonas had left Hamburg during the Easter vacation and had been unavailable to a seriously ill student who was without any adult supervision.[6]

Dragonas stated in her affidavit and deposition that at the December 22 meeting she either denied the reports or at least attempted to explain them. She also requested that Burke put any issues he had in writing, although Burke denies this. Both agree that after Dragonas cited her twenty-five years of GAPP leadership and mentioned that people in the community would be upset if she were relieved of her GAPP duties, Burke warned her to "not go political because [he] had been there." At this meeting, Burke also informed Dragonas that her position as

social studies, and foreign languages). He appointed a new hire for English because the incumbent had left; he did not reappoint the mathematics incumbent, instead selecting an applicant from within the department.

[5]Burke stated that Dragonas's German counterpart told him in the fall of 1999 that the students would be better served if their German language teacher accompanied them. Dragonas described herself as a fluent speaker and proficient writer of German.

[6]Burke stated that two former GAPP parents, one of whom was the parent of the student who was supposedly left ill and unattended, told him Dragonas visited "some Greek island" during the Easter vacation. For her part, Dragonas denied ever leaving Germany during a GAPP trip; however, she admitted that on "different times at Easter" she stayed with her host family in "a summer house north of Germany . . . for a few days." "[T]he students were very well attended to. They had my address, they had my phone number, they kn[e]w where I would be, and the parents were well informed." Dragonas stated that she was never informed that the student in question was ill while she was away from Hamburg.

lead teacher of foreign languages would be abolished at the end of the 1999-2000 school year.[7]

Burke stated that his concerns about the upcoming GAPP trip did not abate in the spring of 2000. In addition to the unresolved housing and MCAS issues, he questioned the prudence of allowing one student with poor attendance and grades to go to Germany.[8] On March 3, 2000, Burke issued a memorandum to Dragonas stating his "desire to reorganize lead teachers . . . along the lines of the MCAS Curriculum and testing areas." He also stated, "I have a number of serious concerns about the Foreign Language Program at Melrose High School that need[] . . . to be addressed."

On March 7, 2000, Martin met with Dragonas and Barbara Quinlan, the business manager for the Melrose schools, and informed Dragonas that he would recommend that her lead teacher position be abolished at the end of the school year due to the MCAS. Martin then offered Dragonas the option of retiring at the end of the school year and suggested that if she backdated her notice of departure to December 23, 1999, she would be eligible to receive a $10,000 sick leave buyback bonus.[9] If she decided to retire, Martin also offered to secure a part-time position for her as administrative assistant to the middle school principal. Dragonas indicated that she was not interested. Martin gave Dragonas a week to accept the offer in case she changed her mind, which she did not.

---

[7]Burke stated that, in early 2000, he proposed to abolish the lead teacher position for foreign languages in order to free up resources for the school to focus on the MCAS exam, which did not have a foreign language component. Martin approved the proposal, but the Melrose school committee voted in May, 2000, to maintain the position. Burke stated that he was not certain whether he had discussed his proposal with Martin before telling Dragonas about it at the December 22 meeting. Moreover, he attested that "[m]y desire to change had nothing to do with Dr. Dragonas's leadership in that department."

[8]Dragonas stated that she had informed the student's mother that he would not be allowed to go to Germany if his attendance did not improve and directed her to address any further inquiries to Burke. The final decision not to let the student go on the trip was made three days before the trip departed.

[9]The contractual deadline for notifying the school committee of retirement was December 31, 1999. However, Martin stated in his deposition that "I would accept a backdated letter and ask the committee out of deference to [Dragonas's] long years of service to give [her] that additional compensation."

On March 9 or 11,[10] Burke convened an "emergency" meeting of twenty-five to thirty GAPP parents to discuss his concerns about Dragonas's leadership of the impending trip to Germany.[11] Burke stated that he did not invite Dragonas to the ninety-minute meeting because he felt that "her overall aggressiveness and defensiveness" would prevent him from getting an "objective and fair view" from the parents. According to parents in attendance, Burke questioned Dragonas's competency to lead the GAPP program and her ability to speak German and stated that, on a previous trip, she had left a student ill and unattended while on a sightseeing trip. In their affidavits, the parents stated that Burke made disparaging comments about Dragonas's character, claiming she had accused him of sexual harassment (which she denied in her deposition). They also attested that Burke stated that Dragonas was someone who would "rip your face off." Burke testified that when he asked the parents whether they wanted him to find another teacher to accompany the students to Germany, they were still willing to have Dragonas accompany the students because of her experience and the trip's imminence. In response to some of the parents' objections to Dragonas's absence from the meeting, Burke apologized to her shortly thereafter.

When Dragonas returned from Germany in May, 2000, Burke did not ask her to participate in hiring new teachers for the foreign languages department — even though this was one of the lead teacher's responsibilities — because he expected her position to be eliminated. Dragonas stated that she felt she was treated as a "persona non grata." After the school committee decided to retain the lead teacher position (see note 7, *supra*), Martin posted the position within the foreign languages depart-

---

[10]Dragonas's brief states that the meeting occurred on "Saturday, March 9," while her verified complaint identifies March 11 as the meeting date. We take judicial notice of the fact that Saturday fell on March 11, 2000. Two parents' affidavits place the date as March 9, but Martin recalled the meeting being held on a Saturday.

[11]Although Burke acknowledged that he probably met with Martin before meeting with the GAPP parents, he stated that they never discussed Martin's retirement offer to Dragonas. Regarding his interactions with Martin, Burke stated, "I meet with Dr. Martin all the time. . . . I might see the superintendent once a day or two or three times . . . ."

ment and advertised the position in the Boston Globe.[12] Three people submitted applications: Dragonas[13]; Mariastella Cocchiara, an Italian and Spanish teacher for twenty-one years in the Melrose public schools, whom Burke had personally encouraged to apply[14]; and a teacher at Salem High School.[15]

A hiring committee comprised of Burke; Thomas Brow, the Melrose Middle School principal; and Gayle Means, an elementary school principal, interviewed the prospective candidates. As summarized by Burke in his affidavit,[16] based on the review of the written applications and interviews, "Mr. Brow, Ms. Means and I agreed that Ms. Cocchiara was far better qualified for the position of Lead Teacher for foreign languages than plaintiff." The hiring committee concluded that "Cocchiara had a strong educational and employment record which, when combined with her additional professional accomplishments, indicated that she would be capable of assuming a leadership role in the foreign language department. Moreover, her computer skills and interpersonal skills led to the conclusion that she was better suited for the position than

[12]Although all five lead teacher positions were posted within the departments, only the foreign languages position was advertised in the newspaper.

[13]Dragonas's qualifications and credentials included the following: B.A. in romance language; M.A. in French language and literature; Ed.M.; Ph.D. in foreign language education and Nineteenth-Century French language and literature; Fulbright scholar; postgraduate work at five universities; participation in multiple curriculum and professional development organizations; certification in Massachusetts for teaching French and Spanish and serving as superintendent and secondary school principal; honors from French and German governments; publications in multiple educational journals; and participation in professional organizations.

[14]Cocchiara's qualifications and credentials included the following: two B.A.'s, in English and Italian; M.A. in Italian literature; enrollment in a master's program in educational leadership; Fulbright scholar; participation in multiple curriculum and professional development programs; publications in multiple scholarly journals; service as a coordinator and chaperone Melrose High School students to Italy; honors from Dante Alighieri Society of America; and participation in professional organizations.

[15]The teacher from Salem High School was not considered as strong a candidate as Dragonas and Cocchiara because of his relative lack of experience at the secondary level.

[16]Burke was the only member of the hiring committee to submit an affidavit or testify at a deposition.

plaintiff, notwithstanding the fact that plaintiff had served in the same or similar position previously."

Burke added that Cocchiara had specific ideas, based on her training and prior experience, about how to integrate computers and the Internet into the curriculum, which was important due to State directives and the school committee's recent decision to invest in a new computer-driven language laboratory.[17] Cocchiara had also explained how she would incorporate foreign languages into the elementary school. Burke stated that Cocchiara was committed to bringing the foreign language teachers together around a common goal and eliminating the "division" and "frustration" they experienced under Dragonas's leadership. Burke also "felt that plaintiff's prior service during the time I observed her had been lackluster at best."

In addition, Burke said that Dragonas interviewed poorly, particularly with respect to her vision for the future and her ideas for integrating technology into the curriculum. In his view, Dragonas essentially stated that she would continue doing what she had done in the past. Her responses to technology questions were unsatisfactory. When asked what "www" and "URL" meant, Dragonas did not know. Burke also stated that Dragonas did not have a plan for introducing foreign languages to fifth graders.

Conversely, Dragonas stated that she did not recall being asked any substantive, in-depth questions about her plans for the elementary schools or technological integration. She described herself as a "visionary." She also said that she "knew what the needs of the department were . . . and . . . was providing resources under certain conditions and circumstances which were budgetary restraints . . . and . . . was hoping . . . what [she] was providing for could be perpetuated for the future . . . and that we could have a good . . . elementary school program." Her sense was that she was "doing everything that needed to be done and more." She also described her computer skills as "adequate" and pointed out that she had taken at least two computer courses for instructional purposes prior to 2000; however, she did not indicate that she had shared this informa-

---

[17]The new computers were installed in the summer of 2000 to replace the outdated tape-based system.

tion with the hiring committee. She denied friction or divisions in the department or that her performance was in any way deficient. The record also contained evidence that Dragonas had very favorable references in regard to her handling of the GAPP program and her position as lead teacher, including from the former superintendent of the Melrose public schools, who was then the Commissioner of Education.[18]

In June, 2000, the hiring committee unanimously recommended Cocchiara, who was twenty-four years Dragonas's junior. Martin subsequently approved Cocchiara's appointment.[19]

Dragonas commenced the present action in November, 2001, seeking damages and injunctive relief for, inter alia, the defendants' alleged violations of G. L. c. 151B, § 4(1C) (counts one and two),[20] and, against Burke and Martin only, aiding and abetting violations of c. 151B (count four), and defamation (count six).[21] Following discovery, the defendants moved for summary judgment on all counts of the complaint, which Dragonas opposed. After a hearing, the judge granted summary judgment for the defendants and allowed, in part, the defendants' motion to strike certain materials submitted by Dragonas in opposition to the motion. On September 25, 2003, judgment was entered for the defendants.

On October 1, 2003, Dragonas moved for reconsideration. On the same day, a different judge denied Dragonas's motion to

[18]These references were struck in part. The judge only allowed them to be "considered to show that Dragonas had provided favorable references." We likewise do not rely on those references to prove the truth of the matters asserted therein.

[19]Paragraphs forty-four to fifty-three of Dragonas's complaint allege events during the 2000-2001 academic year that were part of the motion judge's summary judgment decision, but were not briefed or argued on appeal. For the purposes of this decision, we consider only events that occurred before July, 2000.

[20]Finding that it was not "a separate cause of action," the judge dismissed count two, which sought exemplary damages pursuant to G. L. c. 151B, § 9, for a knowing violation of § 4. The better practice would be to allow the plaintiff to amend her complaint.

[21]On appeal, Dragonas seeks to vacate the judgment as to count six (defamation) only as it relates to Burke, not Martin. She makes no argument on appeal as to count three of her complaint (retaliation) or count five (malicious interference with her employment). We therefore consider those issues waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

strike portions of the summary judgment materials submitted by the defendants.[22] While the motion for reconsideration was pending, Dragonas filed a timely notice of appeal from the judgment and related orders. After the judge declined to reconsider the summary judgment decision, Dragonas filed a second notice of appeal.

*Standard of review.* "[A] party moving for summary judgment in a case in which the opposing party [has] the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), [365 Mass. 824 (1974),] unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

*Defamation.* To prove defamation, the plaintiff must establish that "the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss" (footnote omitted). *White* v. *Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004), citing *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 629-630 (2003).

Dragonas's defamation claim is based upon Burke's statements to the GAPP parents at the meeting in early March, 2000, which she claims impugned her professional character and competence. Specifically, Dragonas finds fault with (1) Burke's statement that on a previous GAPP trip, she went on a sightseeing trip and was unavailable to an ill and unattended student in Hamburg; and (2) Burke's statements questioning her fluency in German. She also highlights his "hyperbolic" statement that she was someone "who would rip your face off." In their memorandum in support of summary judgment, the defendants argued that the statements were either true, nonactionable matters of opinion, or subject to Burke's conditional privilege as Dragonas's supervisor. The motion judge held that Burke was

[22]Our summary judgment analysis is not affected by the matters remaining in dispute regarding the motions to strike. We therefore decline to address the appellate arguments regarding the motions to strike, which are supported by very limited briefing.

entitled to summary judgment because, even assuming that his comments were false and defamatory, he had a conditional privilege to express his concerns to parents.

We conclude that (if false) the statement that Dragonas left a sick child unattended while she was out of town sightseeing was defamatory, particularly when it was combined with other derogatory comments Burke allegedly made about Dragonas's temperament and competence. The truth of the statement is a disputed fact based on the record before us, as is the question whether Burke acted out of malice and thus lost the protection of the conditional privilege.

As the school principal, Burke had a conditional privilege to convey relevant information regarding a teacher to parents planning on sending their children overseas in the teacher's care. The school and the parents shared a common and legitimate interest in the communication of such information. See *Sheehan* v. *Tobin*, 326 Mass. 185, 190-191 (1950); *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 95 (1987); *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. 550, 558 (2003). That information would include the teacher's sense of responsibility for the students under her supervision, her temperament, and her command of the language of the country they were visiting.

A conditional privilege may, however, be lost if the defendant abuses it. The burden of proving abuse of the privilege is on the plaintiff. *Foley* v. *Polaroid Corp.*, 400 Mass. at 95. "The conditional privilege is lost if the defendant (1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably, or excessively." *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. at 558, and cases cited. Lastly, the conditional privilege may be lost if the plaintiff proves the defendant acted out of malice. Malice, in this sense, occurs when the "defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive." *Dexter's Hearthside Restaurant, Inc.* v. *Whitehall Co.*, 24 Mass. App. Ct. 217, 223 (1987). This "may consist either in a direct intention to injure another," *Bratt* v. *International Bus. Machs. Corp.*, 392 Mass. 508, 514 (1984), quoting from *Retail-*

*ers Commercial Agency, Inc., petitioner,* 342 Mass. 515, 521 (1961), or an "intent to abuse the occasion [giving rise to the privilege] by resorting to it 'as a pretence,' . . . or 'reckless disregard' of the rights of another." *Ezekiel* v. *Jones Motor Co.,* 374 Mass. 382, 390 (1978).[23] Reckless disregard of the rights of another can occur through "unnecessary, unreasonable or excessive publication." *Bratt* v. *International Bus. Machs. Corp., supra* at 515.

Although spite or ill will can support a finding of malice, it is not enough to show that the defendant merely disliked the plaintiff or that such animosity was part of the defendant's motivation. Sack on Defamation § 9.3.1 (3d ed. 2005). See Restatement (Second) of Torts § 603 comment a, at 292 (1977) ("[I]f the publication is made for the purpose of protecting the interest in question, the fact that the publication is inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of the privilege"). Instead, the conditional privilege is lost only "if the publication is not made *chiefly* for the purpose of furthering the interest which is entitled to protection" (emphasis supplied). *Ezekiel* v. *Jones Motor Co.,* 374 Mass. at 390 n.4. See *Novecon Ltd.* v. *Bulgarian-Am. Enterprise Fund,* 190 F.3d 556, 567 (D.C. Cir. 1999) (court looks to "primary motive"). Compare Restatement (Second) of Torts § 603 comment a, at 292 (abuse of privilege if publication is "made *solely* from spite or ill will") (emphasis supplied).

In the instant case, there is both a "privileged" and an "unprivileged" explanation for Burke's conduct at the meeting. The privileged explanation was that he was thoroughly and honestly briefing the parents about all of his concerns regarding Dragonas's conduct and competence to ensure that they made a fully informed decision about sending their children to Germany with her. The unprivileged explanation is that he used the occasion as a pretext to demean a teacher he personally disliked, to

---

[23]Regardless of the manner of abuse, loss of the privilege requires at least recklessness on the part of the defendant. *Bratt* v. *International Bus. Machs. Corp.,* 392 Mass. at 514-515. "Simple negligence, want of sound judgment, or hasty action will not cause loss of the privilege." *Dexter's Hearthside Restaurant, Inc.* v. *Whitehall Co.,* 24 Mass. App. Ct. at 223.

generate parental opposition to her participation in a program that she had founded and cared deeply about, and to pressure her into retirement.[24]

Considering the facts in a light most favorable to Dragonas, we hold that a triable issue of fact remains whether Burke abused his conditional privilege. It could be inferred from the tone and substance of Burke's statements — that Dragonas might "rip your face off" and that she had accused him of sexual harassment — that his motivation was not primarily to further a legitimate interest. There was also evidence that Burke had an ongoing antagonistic relationship with Dragonas. See *Ezekiel* v. *Jones Motor Co.*, 374 Mass. at 391-392 (extrinsic evidence of the history of the employment relationship is relevant in determining whether the defendant possessed an improper motive). The timing of Burke's meeting with parents, just six to eight days after his memorandum to Dragonas regarding his desire to reorganize lead teachers along the lines of the MCAS curriculum, and just two to four days after the superintendent's invitation to Dragonas to retire, offers further support for the "unprivileged" explanation.[25]

Given that there are genuine issues of material fact whether (1) the allegedly defamatory comments made at the meeting were false, and (2) the conditional privilege was abused due to malice, we conclude that summary judgment was not appropriate on the defamation claim.

*Age discrimination.* General Laws c. 151B, § 4(1C), inserted by St. 1984, c. 266, § 6, provides that it is unlawful "[f]or the commonwealth or any of its political subdivisions, by itself or its agent, because of the age of any individual, to refuse to hire or employ or to bar or discharge from employment such individual in compensation or in terms, conditions or privileges of employment unless pursuant to any other general or special law."

Where, as here, there is no direct evidence of age discrimina-

---

[24]It could be reasonably inferred, given their regular communications, that Burke was aware of Martin's retirement proposal to Dragonas.

[25]It is worth noting that Burke could have simply removed Dragonas from the trip, particularly if he had not waited until the month before the trip was to commence.

tion,[26] we apply the familiar, three-stage order of proof adopted in *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 138-139 (1976). In undertaking this analysis, we are mindful that "[s]ummary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment . . . because the ultimate issue of discriminatory intent is a factual question." *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 439 (1995).

In the first stage, the plaintiff has the burden to establish a prima facie case, thereby creating a presumption of discrimination. *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 116 (2000). This was accomplished here, as the record was sufficient to demonstrate that (1) Dragonas qualified as a member of the protected class (she was close to seventy years old at the time she was not reappointed); (2) Dragonas was doing her job as lead teacher acceptably, as evidenced by the fact that Burke had not taken any affirmative steps to discharge her during the 1999-2000 school year; (3) Dragonas was not reappointed to the leadership position she had held for many years; and (4) Dragonas was replaced by Cocchiara, who was a substantially younger (by twenty-four years) person with similar qualifications. There is no dispute that Dragonas established a prima facie case of discrimination.

"In the second stage, the employer can rebut the presumption [of discrimination] by articulating 'a lawful reason or reasons for its employment decision [and] produc[ing] credible evidence to show that the reason or reasons advanced were the real reasons.' " *Abramian* v. *President & Fellows of Harvard College, supra*, quoting from *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. at 442. "This burden of production is not onerous." *Blare, supra.*

Here, the defendants successfully rebutted the presumption of

[26]The only direct evidence of age being a consideration was Dragonas's March 7, 2000, meeting with Martin in which he offered Dragonas a retirement deal. But compare *Lee* v. *President & Fellows of Harvard College*, 60 Mass. App. Ct. 836, 842 (2004) (offer of "early retirement package, generally viewed as a benefit to employees, does not evidence age discrimination"). Even if a jury could reasonably infer that Martin and Burke discussed this retirement offer, it is not evidence that the defendants were motivated by discriminatory animus on the basis of age.

discrimination by articulating two interrelated, nondiscriminatory reasons for the decision not to reappoint Dragonas as lead teacher, and supported them with competent proof: (1) although Dragonas and Cocchiara both had excellent credentials, Cocchiara was more technologically savvy and had a better vision for the future of the foreign languages department than Dragonas; and (2) Burke had concerns about Dragonas's performance as lead teacher and GAPP director, including her interpersonal skills, which were compared unfavorably to Cocchiara's. There is credible evidence in the record provided by Burke in his affidavits and Burke and Martin in their deposition testimony to support the defendants' position that these legitimate reasons were the real reasons for the decision to appoint Cocchiara instead of Dragonas.

In the third stage, the plaintiff must present "sufficient evidence from which a reasonable jury could find that at least one of [the employer's] reasons was false," and therefore a pretext from which unlawful discrimination could properly be inferred. *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 498 (2001). See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. at 117 ("[a]t the third stage the employee must show that the basis of the employer's decision was unlawful discrimination[,]" which "may be accomplished by showing that the reasons advanced by the employer for making the adverse decision are not true"); *Waite* v. *Goal Sys. Intl., Inc.*, 55 Mass. App. Ct. 700, 705 (2002) ("evidence, viewed in a light most favorable to the plaintiff, was sufficient to support a finding that at least one of the reasons advanced . . . was false").

Whether Dragonas has presented sufficient evidence here is a close question. The record establishes that the integration of computer skills and technology into the foreign language curriculum was an important consideration for the hiring committee. The school committee was not only being directed by the State to integrate technology into the curriculum, but had also decided to invest in a new computer-driven language laboratory. Furthermore, the hiring committee was looking for a future vision for the department. Burke described Cocchiara as answering questions on these matters insightfully. He also referenced specific suggestions she made that impressed the hiring com-

mittee, which decided unanimously in her favor. In contrast, Dragonas generally could not remember what questions were asked or by whom. She was unable to answer basic questions about the Internet and there is no evidence that she informed the hiring committee of her computer skills and training. Her statements corroborated Burke's assessment that Dragonas intended to continue past practices if reappointed, as she thought she was doing a very good job, and saw little reason for change.

The record also reveals that her past performance as lead teacher for foreign languages was another reason advanced by the employer for the adverse employment decision. This reason was interrelated, at least for Burke, with the first reason.[27] On this issue, we are presented with a hotly contested credibility dispute between Dragonas and Burke — Dragonas describing her performance as "everything that needed to be done and more," and Burke describing it as lackluster and deficient. Moreover, the factual underpinnings of each position — whether Dragonas properly budgeted for the department, kept Burke informed of departmental issues, managed the GAPP program responsibly, led the department without creating unnecessary divisions and frictions due to her personality, supported technology initiatives, and responded to the school administration's MCAS concerns — are contested and dependent almost completely on their conflicting depositions and affidavits. See *Lipchitz* v. *Raytheon Co.*, 434 Mass. at 499. See also *Jackson* v. *University of Pittsburgh*, 826 F.2d 230, 236 (3d Cir.), cert. denied, 484 U.S. 1020 (1987) (denying summary judgment where the issue of pretext turns on credibility issues).

We recognize that comparative evaluations of performance may simply reflect "good faith judgments" and differences of opinion, and that summary judgment may be appropriate in those circumstances. See, e.g., *Brunner* v. *Stone & Webster*

---

[27]We note that Burke focused on Dragonas's over-all performance as lead teacher. He also (1) had a prominent role on the hiring committee, as principal of the high school in which the lead teacher would serve, (2) provided the only source of information in the summary judgment record concerning the deliberations of the committee, and (3) tended to blur his thought process with the committee's. See, e.g., *Waite* v. *Goal Sys. Intl., Inc.*, 55 Mass. App. Ct. at 704-705 (reviewing reasons advanced by employer representatives in their deposition and trial testimony).

*Engr. Corp.*, 413 Mass. 698, 703-704 (1992) ("nothing in the materials submitted pursuant to Mass.R.Civ.P. 56 . . . refutes the evidence that, when the productivity levels, technical expertise, and skills of all the employees were compared, a good faith judgment was made by those with the responsibility to decide that the plaintiff was less qualified").

In such cases, factual disputes underlying performance evaluations will not be enough to defeat summary judgment. For example, in *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34 (2005), a case involving a reduction in force of the legal department of an insurance company, there was "ample, uncontroverted evidence that the negative impression [the manager making the reduction in force decision], staff in the environmental unit, and others had formed of [the plaintiff's] abilities was a primary reason she was selected for layoff." *Id.* at 57. Although the plaintiff presented sufficient evidence to challenge whether she had in fact mishandled the company's environmental work, she did "not challenge whether [the manager] *truly believed* that her mishandling of [an] environmental case jeopardized the Boston office's ability to retain environmental cases" (emphasis added). *Ibid.*[28]

The matter before us, however, is different. In addition to putting almost all the facts underlying the performance evaluation in dispute, Dragonas has also raised triable issues regarding whether the evaluation did not reflect "good faith" judgment on the part of Burke.[29] See *Lipchitz* v. *Raytheon Co.*, 434 Mass. at 498 (in sex discrimination case based on the failure to promote "the jury could have credited [the plaintiff's] contention that the difficulties she had with . . . managers were not the result of her personality and workstyle and therefore, were the result of . . . bias"); *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. at 56 (court's task is "to ensure [that employer's decision making] does not mask discriminatory animus"). On the record before

---

[28]The court stated that there was "no evidence that would allow a fact finder reasonably to conclude that the environmental unit had *not* complained to [the manager] about [the plaintiff's] lack of substantive legal knowledge and responsiveness." *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. at 57.

[29]This is consistent with our determination that there is a triable issue whether Burke's motivation concerning his meeting with GAPP parents constituted malice. See our discussion of defamation, *supra.*

us, a fact finder could determine that Burke's proffered assessment of Dragonas's performance was false and not a good faith judgment, and "[f]rom such proof . . . infer that . . . discriminatory animus was the determinative cause of the adverse employment decision." *Lipchitz* v. *Raytheon Co.*, *supra* at 507. Contrast *Dorman* v. *Norton Co.*, *ante* 7, 9-10 (2005). A trial on the age discrimination claim is therefore required.[30]

*Conclusion.* The judgment on counts one, two, four (as to both Burke and Martin), and six (as to Burke only) is reversed. In all other respects the judgment is affirmed.[31]

*So ordered.*

---

[30]Likewise, a trial on the aiding and abetting claim against Burke and Martin is required. See, e.g., *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 494-495 (2000).

[31]The plaintiff is to have her costs of appeal. See Mass.R.A.P. 26, as amended, 378 Mass. 925 (1979).