# United States Court of Appeals
## For the First Circuit

No. 18-2150

ALAN ZEIGLER,

Plaintiff, Appellant,

v.

MICHAEL RATER,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Chip Muller, with whom Muller Law, LLC was on brief, for appellant.

Rebecca G. Capozzi, with whom Robert L. Bouley and McCarthy, Bouley, Barry & Morgan, P.C. were on brief, for appellee.

October 1, 2019

**SELYA**, **Circuit Judge**.  This case is a defamation case, brought against a psychiatrist who disseminated an allegedly libelous report to an employer about an employee's fitness to return to work after a period of medical leave.  Whether particular speech is actionable as defamation sometimes depends on the role of the speaker, and so it is here.  The challenged speech was published under a conditional privilege.  We conclude that no reasonable jury could find that the defendant abused this privilege.  Accordingly, we affirm the district court's entry of summary judgment in favor of the defendant.

## I. BACKGROUND

We briefly rehearse the facts and travel of the case, viewing the events in the light most hospitable to the nonmoving party (here, the plaintiff).  See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  Plaintiff-appellant Alan Zeigler began working as an information technology professional at Atrius Health, Inc. (Atrius) in 2005.  In January of 2015, Zeigler began reporting to a new supervisor, Christopher Joseph.  Zeigler — who was then in his mid-fifties — contends that Joseph consistently made derogatory remarks about his age.  The stress purportedly caused by these remarks culminated in a panic attack, prompting Zeigler to take medical leave in April of 2015.

Prior to his expected return that June, Zeigler spoke by telephone with an Atrius human resources representative.  During

this exchange, Zeigler stated that he had become so angry with Joseph (before his panic attack) that Joseph "might have got[ten] hurt" had "it been somebody else who had not had the skills to keep [their anger] under control." The human resources department subsequently required Zeigler to undergo a psychiatric evaluation to determine his fitness to return to work.

Atrius enlisted defendant-appellee Dr. Michael Rater to perform this task, following a referral from Scope Medical, LLC (Scope). Dr. Rater was no stranger to such assignments: he supplements his practice by performing fitness-for-duty evaluations for employers through referrals from intermediaries such as Scope. The purpose of a fitness-for-duty evaluation is to assess whether an employee can perform his job without posing a safety risk to other workers or himself.

In preparing to evaluate Zeigler's ability to return to work, Dr. Rater received and reviewed certain documents supplied by Atrius, including medical records from Zeigler's primary care physician. These records contained notations to the effect that Zeigler was "stressed and angry" and "[h]aving difficulty with [his] new director." Dr. Rater conducted an in-person examination of Zeigler on June 11, 2015 for one hour.

In a written report issued on June 26 (the June report), Dr. Rater concluded "to a reasonable degree of medical certainty" that Zeigler had "learned no new skills or techniques to manage

his anger and agitation symptoms" and thus was unfit "to return to his same employment under the same manager." Dr. Rater recommended that Zeigler consult weekly with a mental health provider to develop anger management skills.

Zeigler began seeing Ivy Marwil, a licensed social worker, for regular therapy sessions. After three such sessions, Marwil reported to Dr. Rater that she saw no indication that Zeigler had or would ever act on his anger at work. She added that, in her opinion, Zeigler was ready to return to work at Atrius. At Atrius's behest, Zeigler again saw Dr. Rater on July 30, 2015. Zeigler told Dr. Rater that he had acquired valuable anger management skills in therapy and that he felt positive about the prospect of returning to work. Based on his in-person evaluation and his review of Marwil's letter, Dr. Rater told Scope (in a verbal report on July 30, 2015) that Zeigler was fit to return to work.

On August 4, Zeigler returned to the workplace. Within a few hours of Zeigler's arrival, two coworkers — Jean George and Alida Fountaine — reported unsettling interactions with Zeigler to Adam Centofanti, an Atrius human resources representative. George served as Director of Health Information Management and Site Administrator, and Fountaine served as the Manager of IT Client Services. George and Fountaine first reported their encounters

with Zeigler to Centofanti verbally and, at Centofanti's request, followed up with e-mails.

At 10:59 a.m., George e-mailed the following message to Centofanti:

> With today being Alan Zeigler's first day back into the office, as the Site Administrator I went over to welcome him back. My conversation with Alan had been rather un-nerving given his comments regarding Chris Joseph, and everyone at Atrius. He kept mentioning how he is "suing" and that Atrius wouldn't allow him to come back to work in June. He also mentioned how Chris Joseph stated he was "too old for his role[.]"
>
> Alan referenced numerous organizations that he has filed claims with, and one in particular that he felt the physician that diagnosed him as being aggressive "is being sued for [m]alpractice, I think Atrius told him to say that[.]" He clearly is agitated and I'm concerned with his ability to control his emotions. I kept trying to tell him, it's great to have him back and that it's a new start, but he really is just negative and stated "I won't be here long with all the law suits I have[.]"
>
> Is there a transition plan available for staff returning from an FMLA for both the staff member and the staff that directly report to them?
>
> Happy to help him in any way I can,
> Jean

At 12:07 p.m., Fountaine sent the following e-mail to Centofanti:

> Alan Zeigler stopped by my office this morning around 10:00 or so . . . . I'm not sure if he

was venting, but it was a strange one-sided conversation.

It was the first time I had seen him in a long time - I said 'hi Alan, nice to see you. It's been a while!' Alan agreed, and then added 'I was ready to come back in June but was not allowed to. I used all of my accrued time and then 'they' realized they had to let me come back[.]' He continued to talk about issues with Chris Joseph. He stated that his last day in the office, he had a meeting with Chris J. and HR and he was so angry that he left right after the meeting and could not recall driving home . . . . He had to go to the hospital, his EKG was abnormal, he had a panic attack . . . . He stated that Chris J told him that he was older and should consider a different career, then commented that he had been doing this for 10 years and he knew how to perform his job. He stated that he was told he needed anger management. He stated his wife contacted someone to advise Alan had the flu, and then they started receiving harassing emails.

He spoke about other specifics as well, but I don't remember the details - at one point I started to block him out because he was going on for about 10 minutes and I had no frame of reference so I couldn't follow him. I just kept saying 'I'm sorry Alan, hope everything works out[.]'

He did make a comment about his lawyer - indicating that Chris J had made a comment that was inappropriate.

I thought it was bizarre - it felt strange. This was the first time I had seen him in months, and he immediately started spitting out details about incidents that had allegedly transpired while he was out . . . which I had not been involved with so I couldn't even grasp the information. It was definitely weird. I tried to be positive, change the subject . . . no luck.

After receiving these accounts, Centofanti met with Zeigler and informed Zeigler that coworkers had reported uncomfortable interactions with him.[1] Centofanti placed Zeigler on paid administrative leave, and security personnel escorted him from the building, collecting his access card and keys.

Kirk Hager, the Director of Field HR Operations and Employee and Physician Relations as well as the Director of Labor at Atrius, stated in his deposition that he, Centofanti, and legal counsel for Atrius decided to consult with Scope and Dr. Rater about Zeigler's fitness for duty following Zeigler's ephemeral return to work. Hager, who was on vacation when the decisionmaking process began, stated that he believed Centofanti and legal counsel decided what documents would be sent to Dr. Rater. Upon his return from vacation, Hager approved that compendium of documents (which included George's and Fountaine's written accounts) and authorized the document transmission to Scope. The record contains no evidence about the exact date on which either Scope or Dr. Rater received these materials.

In addition to George's and Fountaine's e-mails, Dr. Rater received the following e-mail authored by Centofanti on August 5, 2015 at 12:39 p.m.:

> I had met with Alan (with security), with the
> knowledge of his recent interactions with Jean

---

[1] Although Zeigler was told that coworkers felt unsettled by his comments, he was not informed of the coworkers' identities.

George and Alida Fountaine. I asked Alan how his day was going. He let me know that things were good, he was settling in and people were coming in and saying Hi. I informed him I had received information that staff members had expressed some discomfort with some of the interactions he had with them. He asked who, and if he could confront them. I let him know that he cannot confront them and I am looking into the concerns. I informed him he has to leave the premises until further notice. I let him know that he was not suspended, and he would be placed on administrative leave and will be paid during this time. I also let him know that this action isn't punitive as we are investigating the concern and will circle back with him as soon as we are able. Alan then informed me that he has filed an MCAD charge and is suing Scope for [m]alpractice. Alan thanked me. Victor (security) escorted him out, collected his access card and keys.

Based on these new pieces of information and his knowledge of Zeigler's full medical record, Dr. Rater issued a written report on August 10, 2015 (the August report), in which he concluded that Zeigler would be unfit to return to work for at least three more months. Relatedly, he stated that coworkers' accounts of Zeigler's "agitation and perseveration" illustrated Zeigler's "lack of ability to perform his essential job functions." Dr. Rater suggested that, while on leave, Zeigler should attend weekly therapy sessions.

In Zeigler's view, the August report contained two libelous statements. First, Dr. Rater wrote that Zeigler was not "psychologically able to provide high-level project management expertise or to coordinate overseeing or carrying out activities

needed to fulfill assigned initiat[ive]s and projects, as he is too distracted and emotionally attached to his grievance issues." Second, Dr. Rater wrote that Zeigler would not be able to "work effectively with coworkers to assure adherence to quality standards," "provide leadership direction and guidance to project personnel," "direct and support staff to assure departmental effectiveness," "interview, select, orient, or train employees," "maintain ongoing relationships with outside agencies, consultants, and contractors," or "represent management on inter-practice and/or cross organizational teams." These statements appear in the "Summary and Conclusions" section of the August report and are labelled in that document as "opinions . . . stated to a reasonable degree of medical certainty."

In late August of 2015, Atrius placed Zeigler on unpaid leave. Zeigler resigned in October of that year, approximately one month after initiating suit against several defendants (including Dr. Rater).[2] Zeigler lodged two claims against Dr. Rater, one for libel per se and one for medical malpractice. In pretrial proceedings, Zeigler voluntarily dismissed the medical malpractice claim. Following the completion of discovery, Dr. Rater moved for summary judgment on the remaining libel claim.

---

[2] Zeigler's claims against the other defendants — Atrius and Joseph — are not implicated in this appeal, and we make no further reference to them.

After briefing and argument, the district court entered summary judgment in Dr. Rater's favor, holding that the challenged statements in the August report were conditionally privileged and that Zeigler had offered insufficient evidence to show that Dr. Rater abused the conditional privilege.[3]  This timely appeal ensued.

## II. ANALYSIS

We now reach the merits of this appeal, mindful that our review of the entry of summary judgment is de novo.  See Faiella v. Fed. Nat'l Mortg. Ass'n, 928 F.3d 141, 145 (1st Cir. 2019).  A district court may grant summary judgment only if "the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law."  McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017), cert. denied, 138 S. Ct. 1311 (2018); see Fed. R. Civ. P. 56(a).  Where, as here, the motion is based upon the absence of a genuine issue of material fact, the nonmovant bears the burden of producing sufficient evidence to identify a dispute of fact that is more than "merely colorable."

---

[3] In his amended complaint, Zeigler premised his libel claim solely on statements made by Dr. Rater in the June report.  When opposing summary judgment, however, Zeigler referred only to statements in the August report.  The district court evaluated Zeigler's libel claim exclusively through the lens of the August report, and the parties have focused their appellate arguments solely on the August report.  Consequently, we confine our analysis to the August report.

- 10 -

Faiella, 928 F.3d at 145 (quoting Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016)).

Since this case is brought under diversity jurisdiction, see 28 U.S.C. § 1332(a), state law provides the substantive rules of decision, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). The parties agree that Massachusetts law controls, and we will "honor the parties' reasonable agreement" on this point. Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011).

Under Massachusetts law, a libel plaintiff must establish that the defendant published "a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004) (footnote omitted); see Sindi v. El-Moslimany, 896 F.3d 1, 13 (1st Cir. 2018). A statement in the form of an opinion may be defamatory but "is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Howell v. Enter. Publ'g Co., 920 N.E.2d 1, 27 (Mass. 2010) (quoting Restatement (Second) of Torts § 566 (Am. Law Inst. 1977)). An "expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation." Lyons v. Globe Newspaper Co., 612 N.E.2d 1158, 1161 (Mass. 1993) (quoting Nat'l

- 11 -

Ass'n of Gov't Emps. v. Cent. Broad. Corp., 396 N.E.2d 996, 1001 (Mass. 1979)).

In asking that we uphold the district court's entry of summary judgment, Dr. Rater submits that the challenged excerpts from his August report constitute nonactionable expressions of opinion. Like the district court, we deem it unnecessary to decide this question: even assuming that the challenged statements were actionable — a matter that we do not decide — they were nonetheless protected by a conditional privilege. We explain briefly.

Massachusetts recognizes a conditional common law privilege for otherwise defamatory statements "where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." Foley v. Polaroid Corp., 508 N.E.2d 72, 79 (Mass. 1987) (quoting Sheehan v. Tobin, 93 N.E.2d 524, 528 (Mass. 1950)). One variant of this conditional privilege arises when the challenged publication "is reasonably necessary to the protection or furtherance of a legitimate business interest." Id. (quoting Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 131 (Mass. 1984)). Another variant arises when an employer "disclose[s] defamatory information concerning an employee" that is "reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." Bratt, 467 N.E.2d at 129. The burden of establishing the existence and applicability of a conditional

privilege rests with the publisher of the allegedly defamatory communication (here, Dr. Rater).  See Jones v. Taibbi, 512 N.E.2d 260, 270 (Mass. 1987).

The parties agree that Dr. Rater's statements in the August report were, as an initial matter, conditionally privileged.  This is consistent with precedent from Massachusetts's highest court — the Supreme Judicial Court (SJC) — which makes it pellucid that a conditional privilege covers the challenged statements.  After all, the SJC recognizes a conditional privilege in cases in which "the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it."  Foley, 508 N.E.2d at 79 (quoting Sheehan, 93 N.E.2d at 528).  Although Atrius did not employ Dr. Rater, Atrius and Dr. Rater plainly shared a common interest in evaluating Zeigler's fitness to return to work, and the allegedly defamatory statements in the August report were published in furtherance of that common interest.  What is more, the SJC has acknowledged the "settled" principle that "a communication respecting the character of an employee . . . is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a definite interest therein." Bratt, 467 N.E.2d at 133 (alteration in original) (quoting Leonard v. Wilson, 8 So. 2d 12, 13 (Fla. 1942)); see Doane v. Grew, 107 N.E. 620, 621 (Mass. 1915) (finding statements about former

- 13 -

servant's "character and capabilities" conditionally privileged when made to prospective employer).

Finally, we note that the SJC already has approved a conditional privilege for disclosures by an employer of medical information relevant to an employee's fitness for duty. See Bratt, 467 N.E.2d at 129. In so holding, the SJC cited approvingly to a district court opinion finding a Navy psychiatrist's statements about a Navy engineer's fitness for duty conditionally privileged. See id. at 133 (citing Hoesl v. United States, 451 F. Supp. 1170, 1176 (N.D. Cal. 1978), aff'd, 629 F.2d 586 (9th Cir. 1980) (per curiam)). We see no reason why the SJC would treat the statements of a psychiatrist referred to an employer by an intermediary for the purpose of conducting a fitness-for-duty examination differently than the statements of an internal psychiatrist performing precisely the same task.

The existence of a conditional privilege, in and of itself, does not fully insulate defamatory speech from tort liability. A conditional privilege may be lost if that privilege is abused. See Tosti v. Ayik, 437 N.E.2d 1062, 1065 (Mass. 1982). The plaintiff must carry the burden of establishing abuse. See Shore v. Retailers Comm. Agency, Inc. (In re Retailers Comm. Agency, Inc.), 174 N.E.2d 376, 379 (Mass. 1961).

Massachusetts law recognizes two ways in which a defendant may relinquish the protection of a conditional

- 14 -

privilege:  by publishing statements recklessly or by publishing statements with actual malice.  See Mulgrew v. City of Taunton, 574 N.E.2d 389, 391 (Mass. 1991).  Here, Zeigler urges us to find that Dr. Rater's statements were made both recklessly and maliciously.  We separate this exhortation into its component parts, first inquiring into Zeigler's claim of recklessness and then inquiring into his claim of actual malice.

1. **Recklessness.**  With respect to recklessness, it is apodictic that a defendant whose statements are conditionally privileged forfeits the privilege if the plaintiff proves, at a minimum, that the challenged statements were "unnecessary, unreasonable, or excessively published."  Foley, 508 N.E.2d at 79.  If, say, communications are privileged only as between certain parties, a defendant may lose the privilege by unnecessarily or unreasonably publishing those communications to parties as to whom they are not privileged.  See Galvin v. N.Y., New Haven & Hartford R.R. Co., 168 N.E.2d 262, 266 (Mass. 1960).  So, too, a defendant may act recklessly by publishing a statement "without reasonable grounds for believing it was true," particularly if the statement concerns "verifiable matters" that are "susceptible of precise check."  Shore, 174 N.E.2d at 381 (holding that trier of fact could find reckless publication where defendant misreported plaintiff's bankruptcy and criminal record).

In this case, Zeigler makes no argument — and the record contains no evidence — that Dr. Rater published the August report excessively or to anyone other than Atrius and Scope (as to each of whom the publication was conditionally privileged). Hence, his claim of recklessness hinges on whether Dr. Rater had reasonable grounds for deeming Zeigler unfit to perform his essential duties. See id.

To this end, Zeigler's principal contention is that a reasonable factfinder could determine that, in compiling the August report, Dr. Rater recklessly relied on coworkers' biased accounts of his ill-fated return to Atrius. Although Zeigler asserts that Dr. Rater based the August report exclusively on the coworker e-mails, the record simply does not support this assertion. Both the August report and Dr. Rater's deposition testimony make pellucid that he viewed those e-mails against the backdrop of his own prior mental status examinations and Zeigler's full medical record.

Even were we to assume that Dr. Rater's statements were largely based on the coworker e-mails, no rational factfinder could conclude, on this record, that Dr. Rater lacked reasonable grounds for making those statements. As a general matter, we think it evident that a medical professional charged with evaluating a subject's fitness for duty may rely on anecdotal evidence — at least when, as in this case, the anecdotal evidence is comprised

- 16 -

of plausible first-hand accounts.  Cf. Sovie v. Town of North Andover, 742 F. Supp. 2d 167, 176 (D. Mass. 2010) (noting that defendant who authored memorandum outlining reasons for plaintiff's termination "was entitled to rely" on other employees' observations); Judd v. McCormack, 535 N.E.2d 1284, 1289 (Mass. App. Ct. 1989) (explaining that defendant who signed letter evaluating plaintiff's performance in training program could rely on veracity of instructors' first-hand observations).

In this instance, the record makes manifest that Dr. Rater had scant reason to question the coworkers' accounts.  After all, the e-mails did not issue from the ether:  they were furnished to Dr. Rater by Atrius human resources representatives, who found the contents credible and concerning.  Indeed, after receiving George's and Fountaine's e-mails, Centofanti acted on them by meeting with Zeigler with security personnel present.  Centofanti then directed a security officer to escort Zeigler from the building and take Zeigler's access card and keys.  Centofanti, Hager, and Atrius's legal counsel subsequently determined, based on this new information, that Dr. Rater should be contacted for another assessment of Zeigler's fitness for duty.  What is more, the coworkers' e-mails collectively bore indicia of reliability in that each contained mutually corroborative descriptions of Zeigler's continuous fixation on his issues with Joseph.

Last — but far from least — none of the three e-mails (including Centofanti's) exudes the slightest whiff of personal animus. All three e-mails indicated that the authors greeted Zeigler cordially, and George went so far as to inform the human resources department that she was eager to "help [Zeigler] in any way."

To be sure, George noted Zeigler's statements about suing Atrius; Fountaine recounted that Zeigler made "a comment about his lawyer" and an "inappropriate" remark by Joseph;[4] and Centofanti mentioned Zeigler's assertion that he had filed a charge against Atrius with the Massachusetts Commission Against Discrimination (MCAD). But nothing in these e-mails suggests that George, Fountaine, or Centofanti was bent on punishing Zeigler for threatening to sue Atrius. The only concrete evidence in the record — Dr. Rater's testimony that he considered the possibility that at least George's e-mail might be tainted by personal hostility but found any potential bias outweighed by the contents of the e-mails and Zeigler's full medical record (which accord with Dr. Rater's ultimate conclusion that Zeigler was unfit to perform his essential duties) — cuts in Dr. Rater's favor. On

---

[4] Although Fountaine stated in her deposition that Zeigler informed her of his plan to sue Joseph during their August 4 encounter, her e-mail did not communicate that point explicitly.

- 18 -

this record, no reasonable factfinder could conclude that Dr. Rater was reckless in giving credence to the coworker accounts.[5]

We likewise reject Zeigler's contention that a reasonable factfinder could distill recklessness from Dr. Rater's failure to conduct a third in-person mental status examination before deeming Zeigler unfit to work. The record contains no evidence that Atrius asked Dr. Rater to conduct another in-person examination of Zeigler. Although Dr. Rater could perhaps have sought permission to reevaluate Zeigler, a disagreement as to whether Dr. Rater took the best possible course of action would not make out a trialworthy issue about whether his statements were published "without a reasonable basis for forming a belief in their truth." Catrone v. Thoroughbred Racing Ass'ns of N. Am., 929 F.2d 881, 891 (1st Cir. 1991). Simply showing a deviation from best practices, without more, does not suffice to ground a finding of recklessness. Cf. Shore, 174 N.E.2d at 380 (explaining that plaintiff must show more than "want of sound judgment" or "hasty or mistaken action" to establish defendant's abuse of conditional privilege (quoting Pecue v. West, 135 N.E. 515, 517 (N.Y. 1922))).

---

[5] Of course, a defendant may act recklessly by publishing inaccurate statements about matters that are susceptible of precise verification (such as a bankruptcy or criminal record). See Shore, 174 N.E.2d at 381. Here, however, coworkers' impressions of their encounters with Zeigler were not verifiable matters capable of being confirmed by quick reference to external sources.

Even if a jury could find Dr. Rater negligent for assessing Zeigler's fitness for duty without conducting yet another in-person mental status evaluation — and we do not suggest that such a finding would be warranted — the SJC has left no doubt that mere negligence does not destroy a conditional privilege. See Bratt, 467 N.E.2d at 131.

That ends this aspect of the matter. No reasonable factfinder could conclude that Dr. Rater abused the conditional privilege by way of recklessness because of his reliance on the coworker e-mails, his failure to perform a third in-person mental status examination, or any combination thereof.

**2. Actual Malice.** Zeigler's remaining attempt to escape the confines of the conditional privilege — actual malice — fares no better. In this context, actual malice occurs when "defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive." Dexter's Hearthside Rest., Inc. v. Whitehall Co., 508 N.E.2d 113, 117 (Mass. App. Ct. 1987); see Doane, 107 N.E. at 622. Such an ulterior motive may take the shape of "a direct intention to injure another," Dragonas v. Sch. Comm., 833 N.E.2d 679, 687 (Mass. App. Ct. 2005) (quoting Bratt, 467 N.E.2d at 131), or an "intent to abuse the occasion [giving rise to the privilege] by resorting to it 'as a pretence,'"

id. (alteration in original) (quoting Ezekiel v. Jones Motor Co., 372 N.E.2d 1281, 1287 (Mass. 1978)).

Evidence that a defendant simply disliked the plaintiff or was partially motivated by personal animosity, without more, is insufficient to establish actual malice. See id. at 688; see also Sheehan, 93 N.E.2d at 530. If the publication was "made for the purpose of protecting the interest in question, the fact that the publication [was] inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of privilege." Restatement (Second) of Torts § 603 cmt. a; see also Dragonas, 833 N.E.2d at 688. Rather, a defendant cedes the protection of the conditional privilege through actual malice only "if the publication [was] not made chiefly for the purpose of furthering the interest which is entitled to protection." Dragonas, 833 N.E.2d at 688 (emphasis in original) (quoting Ezekiel, 372 N.E.2d at 1287 n.4).

Zeigler contends that a reasonable jury could find that Dr. Rater deemed him unfit to work in order to punish him for threatening suit against Dr. Rater and Scope. Although it is undisputed that Dr. Rater knew about Zeigler's threat to sue for malpractice at the time of the August report, Zeigler extrapolates an entirely speculative theory of punitive animosity from this meager kernel of evidence. To begin, the record is devoid of any indication that Dr. Rater gave Zeigler's comments concerning

- 21 -

litigation any weight in compiling the August report. So, too, the record contains nothing suggesting that Dr. Rater harbored any ill will toward Zeigler because of those remarks. Indeed, Dr. Rater's recommendation in the August report was measured and bore no indicia of animus: rather than recommending that Atrius terminate Zeigler, Dr. Rater recommended only that Zeigler seek reconsideration of his fitness for duty after three additional months of counseling.

To cinch the matter, even were we to assume that Dr. Rater harbored some antipathy toward Zeigler due to his mention of a suit, it would not be enough for Zeigler to show that such antipathy constituted merely a part of his motivation for authoring the challenged statements. See id. The conditional privilege would be lost only if the evidence could support a finding that Dr. Rater's statements were "not made chiefly for the purpose of" providing an honest assessment of Zeigler's fitness for duty (the interest underlying the conditional privilege between Dr. Rater and Atrius). Id. (emphasis in original) (quoting Ezekiel, 372 N.E.2d at 1287 n.4); see Catrone, 929 F.2d at 890; Restatement (Second) of Torts § 603 cmt. a. Even when viewed in the light most favorable to Zeigler, the record reveals no evidence that would permit such a finding. Dr. Rater maintained in his deposition that the focus of the August report was his evaluation of Zeigler's mental state and ability to perform his duties, and

Zeigler offers no evidence to contradict this testimony or otherwise demonstrate a genuine dispute of material fact about Dr. Rater's dominant motivation for disseminating the challenged statements.

Generally speaking, actual malice may be inferred from the parties' relationship and the circumstances surrounding the publication. See Galvin, 168 N.E.2d at 266. Even so, courts are not required to "draw unreasonable inferences or credit bald assertions [or] empty conclusions" in adjudicating summary judgment motions. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018) (alteration in original) (quoting Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)). Here, Zeigler's rank speculation that Dr. Rater deemed him unfit to work in order to punish him for the threat of prospective litigation is insufficient to block Dr. Rater's quest for summary judgment.

The short of it is that no reasonable factfinder could conclude that Dr. Rater was motivated chiefly by retaliatory animus when he declared Zeigler unfit to return to work in the August report. Accordingly, Zeigler's claim of actual malice fails.

## III. CONCLUSION

We need go no further. The district court correctly found Dr. Rater's statements in the August report conditionally privileged, and Zeigler has failed to summon sufficient evidence

- 23 -

to establish any abuse of that privilege.  We hold, therefore, that the district court did not err in granting summary judgment in Dr. Rater's favor.

**Affirmed.**