# United States Court of Appeals
## For the First Circuit

No. 07-2159

ALAN S. NOONAN,

Plaintiff, Appellant,

v.

STAPLES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, U.S. District Judge]

Before

Torruella, Wallace,[*] and Lipez,
Circuit Judges.

Wendy Sibbison, with whom Richard M. Gelb, Stamenia
Tzouganatos, Daniel K. Gelb, and Gelb & Gelb LLP, were on brief for
appellant.
Ariel D. Cudkowicz, with whom Krista Green Pratt and Seyfarth
Shaw LLP, were on brief for appellee.

February 13, 2009

---

[*] Of the Ninth Circuit, sitting by designation.

TORRUELLA, **Circuit Judge**.  Alan S. Noonan was fired from his job as a salesman at Staples, Inc. for allegedly padding expense reports.  A Staples executive then sent a mass e-mail to about 1,500 employees informing them that Noonan had been fired for violating the company's travel and expense policy.  Staples also denied Noonan his severance benefits and refused to allow him to exercise his stock options, claiming that, under the terms of the agreements setting forth the right to these benefits, Noonan was ineligible because he had been fired "for cause."  Noonan sued Staples in Massachusetts court for libel and breach of those agreements, and Staples removed to federal court.  Both parties moved for summary judgment, the district court granted summary judgment in favor of Staples, and Noonan now appeals.

We initially affirmed the grant of summary judgment.  Noonan v. Staples, Inc., 539 F.3d 1 (1st Cir. 2008).  But, on panel rehearing, we withdraw our prior opinion and issue this opinion in which we affirm in part, reverse in part, and remand.

## I.  Background

Because this case comes to us on appeal from summary judgment, we relate the relevant facts in the light that most favors the nonmovant, Noonan.  Franceschi v. U.S. Dep't of Veterans Affairs, 514 F.3d 81, 83 (1st Cir. 2008).  Noonan was a Staples sales director who did much traveling for business and had to compile expense reports to be reimbursed for travel, food, and

-2-

other business-related expenses. Staples had a travel and expense policy requiring employees to submit receipts for all expenses over $75, and for all meals regardless of price; to use their corporate credit card for business expenses instead of their personal credit card; and to book all work-related travel through Staples's travel department. Noonan claims, with support in the record, that these directives were irregularly enforced and often not followed by many employees.

In November 2005, Staples discovered that an employee named James Dorman had been embezzling money from the company through fraudulent expense claims and fired him. It then undertook an audit of expense reports based on a sample of sixty-five traveling employees in the North American Division, including Noonan. Auditors investigating Noonan discovered a May 2005 expense report in which he had requested $1,622 in excess of what he had actually spent. The team also found that Noonan had used his personal credit card for many of these purchases, had booked the travel through a non-company travel agent, and had failed to submit all the required receipts.

These anomalies led Staples to assemble a special team, composed of certified accountants and a former police investigator, to look further into Noonan's past expense reports. Noonan admitted to the team that he often "pre-populated" his reports before a given trip -- that is, he estimated what his expenses

would be in advance, and submitted the report with these estimates, but with (Noonan claims) the intention to amend the report later to the extent the actual expenses differed from the estimates. The team found that Noonan had failed to enter such adjustments on a number of expense reports and discovered other anomalies, such as entries where the amount claimed was exactly $100 more than what the item actually cost, and entries where decimal points had been shifted two places to the right (resulting, for example, in an $1,129 meal at an airport McDonald's, instead of $11.29). Noonan also committed errors in Staples's favor. When the team asked him about the large amounts of extra money that had been deposited into his checking account, Noonan responded that he had not noticed.

Based on its findings, the team unanimously concluded that Noonan had deliberately falsified the audited expense reports and, as a result, Staples fired him. It sent him a letter stating that he had been terminated "for cause" for violating the travel and expense policy and the company's Code of Ethics, and that he was consequently ineligible for severance benefits. The following day, Executive Vice-President Jay Baitler sent an e-mail to all the employees in Staples's North American Division, a group whose precise number is unknown and disputed, but that totaled somewhere around 1,500 people. The e-mail stated as follows:

> It is with sincere regret that I must inform you of the termination of Alan Noonan's employment with Staples. A thorough investigation determined that Alan was not in

-4-

compliance with our [travel and expenses] policies. As always, our policies are consistently applied to everyone and compliance is mandatory on everyone's part. It is incumbent on all managers to understand Staples['s] policies and to consistently communicate, educate and monitor compliance every single day. Compliance with company policies is not subject to personal discretion and is not optional. In addition to ensuring compliance, the approver's responsibility to monitor and question is a critical factor in effective management of this and all policies.

If you have any questions about Staples['s] policies or Code of Ethics, call the Ethics Hotline . . . or ask your human resources manager.

Over the course of Noonan's employment, he and Staples entered into two stock-option agreements, dating respectively from 1992 and 2004 (respectively, the "1992 Stock-Option Agreement" and the "2004 Stock-Option Agreement"). The pertinent language in the 1992 Stock-Option Agreement provided as follows:

[I]f [Noonan's] relationship with Staples is terminated by Staples for "cause" (as defined below) . . . the right to exercise this option with respect to any shares not previously exercised shall terminate immediately . . . .

"Cause" shall mean willful misconduct by [Noonan] or willful failure to perform his or her responsibilities in the best interests of Staples (including, without limitation, breach by [Noonan] of any provision of any employment, consulting, advisory, nondisclosure, non-competition or other similar agreement between [Noonan] and Staples), as determined by Staples, which determination shall be conclusive.

-5-

(Emphasis added.)  The 2004 Stock-Option Agreement contained this language, and added other grounds constituting "cause," including "violation by [Noonan] of the Code of Ethics or an attempt by [Noonan] to secure any improper personal profit in connection with the business of Staples."

Six days before being fired, Noonan sent Staples a $290,714.40 check and notified it that he was exercising his vested right to purchase 23,825 shares of stock -- 22,700 governed by the 1992 Stock-Option Agreement, and 1,125 governed by the 2004 Stock-Option Agreement.  Staples returned the check uncashed, noting that the investigation into Noonan's expense-reporting practices was ongoing, and that if Staples ultimately terminated him for cause, he would not be entitled to gains on the shares.  Staples did not ultimately allow Noonan to exercise the stock options.

Noonan also had a severance agreement with Staples which stated that Staples would not be required to pay benefits if Noonan was terminated "for '[c]ause'" -- that is, if Noonan "wilfully fail[ed] to substantially perform [his] duties with Staples," "violate[d] the Code of Ethics or attempt[ed] to secure any improper personal profit," or "engage[d] in misconduct which is demonstrably and materially injurious to Staples . . . ."  On these grounds, Staples did not give Noonan severance benefits.

Noonan, a Florida resident, filed suit in Massachusetts state court; Staples, a Massachusetts corporation, removed to the

-6-

U.S. District Court for the District of Massachusetts. Noonan's complaint alleged (1) libel based on the Baitler e-mail; (2) breach of the two stock-option agreements; and (3) breach of the severance agreement.[1] Noonan moved for summary judgment on a portion of the libel claim and on the claim alleging breach of the stock-option agreements; Staples filed a cross-motion for summary judgment on all counts in the complaint. The district court granted summary judgment on behalf of Staples. On the libel claim, the district court determined that what was stated in the e-mail was true, and that Noonan had presented no evidence of actual malice on the part of Staples. On the breach-of-contract claims, the court found that Noonan had been fired for cause and that, pursuant to the terms of the agreements, he was therefore ineligible for the stock options and benefits. Noonan now appeals.

## II. Discussion

### A. Standard of Review

We will affirm a district court's summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At summary judgment, the court's task is not "'to weigh the evidence and determine the truth

---

[1] Noonan made two other claims that were also dismissed by the district court. He does not appeal those dismissals.

of the matter but to determine whether there is a genuine issue for trial.'" Asociación de Periodistas de P.R. v. Mueller, 529 F.3d 52, 55 (1st Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). We accord plenary review to summary judgment and view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor. Franceschi, 514 F.3d at 84.

### B. Libel Claim

Noonan claims first that Staples committed actionable libel against him through the sending of the Baitler e-mail. Under Massachusetts law, a plaintiff alleging libel must ordinarily establish five elements: (1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss.[2] Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006) (citing White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004)); Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 2006) (quoting McAvoy v. Shufrin, 518

---

[2] The parties do not dispute that the first element of Noonan's libel claim, which "requires that the defendant communicate the defamatory statement to a third party," White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004), was satisfied by the sending of the Baitler e-mail to some 1,500 Staples employees. The parties likewise do not dispute that the e-mail concerned the plaintiff, Noonan. Of the remaining three elements, only the element of falsity has been challenged on appeal.

N.E.2d 513, 517 (Mass. 1988)).  A statement is defamatory if it "may reasonably be read as discrediting [the plaintiff] in the minds of any considerable and respectable class of the community." Disend v. Meadowbrook Sch., 604 N.E.2d 54, 55 (Mass. App. Ct. 1992) (citing Sharratt v. Housing Innovations, Inc., 310 N.E.2d 343, 346 (Mass. 1974)); accord White, 809 N.E.2d at 1036.  Generally, under Massachusetts law, summary judgment for a libel defendant is appropriate if "the publication is not reasonably capable of any defamatory meaning, and cannot reasonably be understood in any defamatory sense."  Sharratt, 310 N.E.2d at 345 (quoting King v. Ne. Publ'g Co., 2 N.E.2d 486, 487 (Mass. 1936)); see also Smith v. Suburban Rests. Inc., 373 N.E.2d 215, 217 (Mass. 1978) ("Inferences which might be drawn by a considerable and respectable segment of the community can make a publication actionable."); Amtrak Prods., Inc. v. Morton, 410 F.3d 69, 72 (1st Cir. 2005) (in determining whether statement was defamatory, courts ask what a "reasonable reader" would think upon reading it) (quoting Foley v. Lowell Sun Publ'g Co., 533 N.E.2d 196, 197 (Mass. 1989)).

Since a given statement, even if libelous, must also be false to give rise to a cause of action, the defendant may assert the statement's truth as an absolute defense to a libel claim. Mass. Sch. of Law at Andover, 142 F.3d at 42 (citing Bander v. Metro. Life Ins. Co., 47 N.E.2d 595, 598 (Mass. 1943)); McAvoy, 518 N.E.2d at 517.  Massachusetts law, however, recognizes a narrow

exception to this defense: the truth or falsity of the statement is immaterial, and the libel action may proceed, if the plaintiff can show that the defendant acted with "actual malice" in publishing the statement. White, 809 N.E.2d at 1036 n.4 (citing Mass. Gen. Laws ch. 231, § 92).

Noonan argued before the district court, and reiterates before us, that Baitler's e-mail was both defamatory and false, and thus constituted actionable libel. Staples countered that the evidence clearly established that Noonan did indeed violate the company's travel and expense policy, and that the e-mail was consequently true and no libel action could lie. The district court sided with Staples, concluding that Noonan's libel claim could not proceed as a matter of law because the Baitler e-mail was true: even when viewed in the light most favorable to Noonan, the record demonstrates that he failed to comply with the policy. Our review of the record and Massachusetts law leads us to the same conclusion. Thus, there is no triable issue of fact on the question of truth.

We focus first on Noonan's arguments concerning the e-mail's falsity, because if the evidence corroborates Staples's asserted defense that the e-mail's contents were true, then absent actual malice on the part of Staples, the libel claim must be dismissed regardless of whether the e-mail defamed Noonan. See id. at 1036. Noonan does not seriously challenge that, on their face,

all the sentences in the e-mail were true.  As the e-mail states and the record bears out, Staples did indeed commission an investigation of Noonan's expense-reporting practices, and the investigators determined that he was not in compliance with the travel and expense policy.  Even Noonan admits that he frequently disregarded the letter of the policy, booking travel with non-company travel agents, using his personal credit card instead of the company card, and failing to turn in receipts.  Whether, as Noonan asserts, he actually saved Staples money -- through, for example, buying cheaper plane tickets from online agents or committing mathematical or typographical errors on his expense reports in Staples's favor -- is immaterial.[3]  Whether, as Noonan asserts, many other traveling employees also regularly disregarded the policy is likewise irrelevant.  Even taking these assertions as accurate, they do not change the simple fact relayed in the e-mail, and supported by the evidence in the record, that Staples fired Noonan after an investigation determined him to be out of compliance with the travel and expense policy.

Noonan urges us, however, to look beyond the letter of the e-mail to the effect it must have had on its approximately 1,500 recipients.  He argues that reasonable recipients could have

---

[3]  For this reason, we need not attempt to determine whose calculations -- Noonan's or Staples's -- were correct, or whether it was Noonan or Staples who received the ultimate windfall from Noonan's typographical and mathematical errors.

read other passages in the e-mail and, viewing the e-mail in its totality, drawn the inference that he arrogantly regarded Staples's policies as subject to his personal whim and committed some sort of grave misconduct -- grave enough that Baitler himself departed from company policy on employee privacy by referring to Noonan by name in the e-mail. Indeed, according to Noonan, the e-mail's reference to an "investigation," the recent experience with the firing and later indictment of Dorman for stealing money from the company, and the fact that Staples took the drastic step of terminating Noonan instead of merely reprimanding him or delaying the relevant reimbursements, could have led reasonable readers to conclude that he, like Dorman, committed a crime. At the very least, the e-mail's reference to the company Code of Ethics could have given reasonable readers the impression that Noonan was terminated for illegal or unethical conduct in the reporting of his travel expenses. As support for these arguments, Noonan cites a number of cases applying Massachusetts law and holding that, to determine whether a given statement is defamatory, the court must look at it as a whole and in the context in which it was published. See, e.g., Stanton, 438 F.3d at 125, 128; Foley, 533 N.E.2d at 197 (court must examine statement "'in its totality in the context in which it was uttered or published[,] . . . consider[ing] all the words used, not merely a particular phrase or sentence'" (quoting Myers v. Boston Magazine Co., 403 N.E.2d 376, 379 (Mass. 1980));

Smith, 373 N.E.2d at 218; Sharratt, 310 N.E.2d at 346 ("attendant circumstances may be shown as proof of the defamatory nature of the words"); Disend, 604 N.E.2d at 55 ("Words not inherently disparaging may . . . have that effect if viewed contextually, i.e., in the light of attendant circumstances." (citing Sharratt, 310 N.E.2d at 346)).

Crucially, all of Noonan's cited cases concern how a court determines whether a given statement is, or could be understood as, defamatory,[4] and not with the separate inquiry of whether the statement is true or false. As noted above, the impugned statement must be both defamatory and false for a libel action to lie, and these are distinct elements. Without saying so explicitly, Noonan is, in essence, asking us to import the corpus of legal principles for determining a statement's defamatory nature into the examination of the statement's truth or falsity. Noonan wants us to adopt a rule whereby even an objectively true statement can give rise to a libel claim if reasonable readers might infer from it other, untrue characteristics of the plaintiff or conduct by him.

---

[4] Massachusetts courts engage in a similar inquiry when determining the second element of a libel claim -- whether the statement is of or concerning the plaintiff. See, e.g., Stanton, 438 F.3d at 128 ("Like the question of whether a communication can reasonably be understood to be defamatory, whether a communication can reasonably be understood to be of and concerning the plaintiff depends on the circumstances." (citing New Eng. Tractor-Trailer of Conn., Inc. v. Globe Newspaper Co., 480 N.E.2d 1005, 1010 n.5 (Mass. 1985))).

-13-

Unfortunately for Noonan, our survey of the relevant Massachusetts law has uncovered no clear support for this interpretation, and we are reluctant to recognize such a significant expansion in view of our limited role as a federal court sitting under our diversity jurisdiction.  See Gill v. Gulfstream Park Racing Ass'n, Inc., 399 F.3d 391, 402 (1st Cir. 2005) ("A federal court sitting in diversity cannot be expected to create new doctrines expanding state law."); A. Johnson & Co., Inc. v. Aetna Cas. & Sur. Co., 933 F.2d 66, 73 n.10 (1st Cir. 1991) (diversity plaintiff "cannot expect this court 'to torture state law into strange configurations or precipitously to blaze new and unprecedented jurisprudential trails'" (quoting Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1224 (1st Cir. 1990))).  Instead, the relevant Massachusetts cases reveal the truth-or-falsity inquiry to be a much simpler one.  Our review of the record in the light most favorable to Noonan reveals no triable issue of fact because, as Staples asserts, everything said in the e-mail was true -- or at least substantially true -- and substantial truth is all that is required.[5]  See Murphy v. Boston Herald, Inc., 865 N.E.2d 746, 754 (Mass. 2007); Jones v. Taibbi, 512 N.E.2d 260, 266 (Mass. 1987).[6]

---

[5]  Thus, even though Noonan may dispute whether the investigation was, as the Baitler e-mail characterized it, "thorough," this minor detail does not deprive the e-mail of its substantially true character.

[6]  To the extent the brief discussion in Perry v. Hearst Corp., 334 F.2d 800, 801-02 (1st Cir. 1964), suggests a different outcome, we

-14-

Given this holding, Noonan's only hope for keeping his libel claim alive is to prove that Staples -- or other employees responsible for composing and sending the e-mail -- acted with actual malice. As noted above, under Massachusetts law, even a true statement can form the basis of a libel action if the plaintiff proves that the defendant acted with "actual malice." Mass. Gen. Laws ch. 231, § 92; White, 809 N.E.2d at 1036 n.4; Conroy v. Fall River Herald News Publ'g Co., 28 N.E.2d 729, 731-32 (Mass. 1940).[7]

The relevant statute, Mass. Gen. Laws ch. 231, § 92, passed in 1902, does not define the term "actual malice."[8] Noonan argues that the term "actual malice" refers to actual malevolent intent or ill will. Though we initially concluded otherwise, on rehearing we now agree.

---

do not believe that such an outcome comports with Massachusetts law as it stands today.

[7] This exception to the truth defense is not constitutional when applied to matters of public concern. Shaari v. Harvard Student Agencies, Inc., 691 N.E.2d 925, 927 (Mass. 1998). In the rehearing proceedings, Staples has suggested that this exception to the truth defense may never be constitutional. But this argument is not developed now and was not raised in the initial briefing. Accordingly, we do not consider it at this time. See Johnson v. Mahoney, 424 F.3d 83, 96 (1st Cir. 2005).

[8] The statute provides, in its entirety: "The defendant in an action for writing or for publishing a libel may introduce in evidence the truth of the matter contained in the publication charged as libelous; and the truth shall be a justification unless actual malice is proved." Mass. Gen. Laws ch. 231, § 92.

-15-

A 1903 case from the Massachusetts Supreme Judicial Court explains that the term meant "malicious intention." Conner v. Standard Publ'g Co., 67 N.E. 596, 598 (Mass. 1903). Since 1964, however, the term "actual malice" has taken on a new meaning in defamation cases involving public figures; in this context, a person acts with "'actual malice'" when he acts "'with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not.'" Cantrell v. Forest City Publ'g Co., 419 U.S. 245, 251 (1974) (alteration in original) (quoting New York Times v. Sullivan, 376 U.S. 254, 280 (1964)). But, the Supreme Court has explained that actual malice in the public-figure context is different than "common-law malice" or "ill will," which is sometimes required under state law. Id. at 251-52.

Though the Massachusetts statute at issue in this case also uses the term "actual malice," we are persuaded that we should not read that term as having the specialized meaning later developed by the Supreme Court. We had initially reached a different conclusion after considering Rotkiewicz v. Sadowsky, 730 N.E.2d 282 (Mass. 2000). In that public-figure case, the Supreme Judicial Court stated that "[i]n the context of defamation, the term 'actual malice' does not mean the defendant's dislike of, hatred of, or ill will toward, the plaintiff," but rather whether the defendant acted with knowledge of falsity or reckless disregard for whether a statement was true or false. Id. at 289 (emphasis

-16-

added).  Based on this language, we had concluded that the public-figure definition of actual malice applied throughout "the context of defamation."  See also Richard W. Bishop, 17A Mass. Practice § 43.6 n.5 (supporting this conclusion).

We now reject this conclusion for a number of reasons. First, since the statute was passed before the development of the modern definition of actual malice, it would not be consistent with legislative intent to read it as applying a more modern definition. See Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court, 858 N.E.2d 699, 708 (Mass. 2006) ("The object of all statutory construction is to ascertain the true intent of the Legislature from the words used." (quoting Champigny v. Commonwealth, 661 N.E.2d 931, 933 (1996))).[9]  Since the Legislature of 1902 could not have intended to apply the modern definition of "actual malice," we will not apply it here, absent an explicit contrary interpretation from the Supreme Judicial Court. Rotkiewicz is not such precedent; it was a public-figure case and was not interpreting Mass. Gen. Laws ch. 231, § 92.  Rotkiewicz, 730 N.E.2d at 289.

Second, the legal context supports construing "actual malice" as "ill will" or "malevolent intent."  First, since the

_____

[9]  Where necessary, we "render interpretations of state law by using the same methods that the state court would use."  National Pharms., Inc. v. Feliciano-de-Melecio, 221 F.3d 235, 241 (1st Cir. 2000).

-17-

statute deals not with public figures, but with defenses under traditional tort law, it is more appropriate to use the traditional tort law meaning of the term. Second, application of the modern meaning would produce the odd result that there would only be liability for true statements where the speaker acted with knowledge or recklessness as to the statement's falsity. The statute, however, was not likely meant only to apply to the rare case where a defendant utters a true statement which he seriously doubts or sincerely disbelieves. Finally, in the public-figure context, the "actual malice" test applies to statements of public concern, an area in which defamatory true statements are not actionable at all. See Phila. Newspapers v. Hepps, 475 U.S. 767, 768-69 (1986) (limiting recovery for true statements). Thus, applying this test in the case of true statements would be incongruous, as the modern "actual malice" test does not normally apply to true statements. See Seideman v. City of Newton, 895 N.E.2d 439, 444 (Mass. 2008) ("Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense."). For all these reasons, we conclude that Mass. Gen. Laws ch. 231, § 92 means "common-law malice" when it uses the term "actual malice." See also Shaari v. Harvard Student Agencies, Inc., No. CA 907810D, 1996 WL 1186873, at *9 (Mass. Super. Ct.

July 19, 1996) ("To establish 'actual malice,' as that term is used in § 92, plaintiff need only prove 'disinterested malevolence' rather than 'knowing falsity' or 'reckless disregard for the truth on the part of the defendants.'"), rev'd on other grounds by 691 N.E.2d 925 (Mass. 1998).[10] Although we recognize that in exercising our diversity jurisdiction we must tread lightly in offering interpretations of state law where controlling precedent is scarce, Gill, 399 F.3d at 402, we are also obliged to provide our "best guess" as to open questions of state law when necessary. Liberty Mutual Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 65 (1st Cir. 2001). In this case, we conclude that the relevant state precedents and the traditional canons of statutory construction dictate the interpretation provided above.

The district court concluded that there was no evidence of actual malice. Viewing "actual malice" as "ill will," we disagree. First, in Baitler's twelve years with the company, he had never previously referred to a fired employee by name in an e-mail or other mass communication. From this evidence, a jury could permissibly infer that Baitler singled out Noonan in order to

_____

[10] This conclusion is also supported by another Massachusetts Appeals Court case. In Mihalik, that court ruled that "the meaning of 'actual malice' as used in [§ 92] plainly cannot be continued with respect to public officers and public figures." Mihalik v. Duprey, 417 N.E.2d 1238, 1242 (Mass. App. Ct. 1981). If "actual malice" in § 92 meant the same as it does in the public figure cases, the Mihalik court would not have needed to note the need for a change, since the constitutional protection afforded by that standard would already be in place.

-19-

humiliate him. To be sure, Staples has offered a non-malicious explanation. Baitler stated in his deposition that he considered the e-mail naming Noonan to be important in effectively making the point to his employees that they must comply with Staples's travel and expense policies. But, a jury could nevertheless conclude that Baitler's explanation for the deviation from policy was pretextual. Cf. Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998) (noting, in a discrimination case, that "[d]eviation from established policy or practice may be evidence of pretext").[11] Further, should the jury reject this explanation, such conclusion might lend further support to an inference of malicious intent. Cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (noting, in the discrimination context, that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive"). Considering the conflicting explanations evinced by the record, it is properly for the jury to decide whether to credit Baitler's explanation or instead to draw the competing inferences advanced by Noonan.

---

[11] Cf. Havlik v. Johnson & Wales Univ., 509 F.3d 25, 33-34 (1st Cir. 2007) (rejecting plaintiff's argument that malice was shown by a decision, which deviated from prior practice, to identify plaintiff in university crime alert, on the basis of the fact that the identity of the suspect was not usually known in previous cases). Unlike the defendant in Havlik, Staples has made no showing that Noonan was not similarly situated to other previously fired Staples employees.

Second, Baitler had supervised Dorman and had failed to notice his misfeasance. Moreover, Baitler did not send around a similar e-mail regarding Dorman's actions. Noonan explains that he will argue to the jury that they should infer that Baitler singled out Noonan to detract attention away from the Dorman scandal. These facts, while speculative on their own, could provide additional background to support Noonan's pretext argument.

Third, Baitler sent the e-mail to a list of 1500 or 1600 employees of Staples. Noonan contends that many individuals on that list did not travel and so had no reason to be advised of the travel policy. Noonan will thus ask the jury to infer that the e-mail's excessive publication shows Baitler's, and thus Staples's, malevolent desire to harm Noonan's reputation. Cf. Dragonas v. Sch. Comm. of Melrose, 833 N.E.2d 679, 687-88 (Mass. App. Ct. 2005) (explaining that "excessive publication" can show malice sufficient to defeat a conditional privilege). The record is not clear as to the identity and job description of each person who received the e-mail.[12] But even in its present state, the record permits, though

_____

[12] Noonan contends that Staples improperly deleted the original electronic version of the e-mail despite Noonan's lawyer's written request. According to Noonan, this deletion made it impossible to determine exactly who was on the list and how many people the list included. Noonan contends that the e-mail's deletion raises a permissible inference that the destroyed evidence shows excessive publication. We need not reach the issue of the destruction of the e-mail at this time, since the summary judgment record already establishes that the e-mail was widely distributed. As noted above, whether that distribution was so wide as to show malice will be a question for the jury.

certainly does not require, a conclusion that publication was excessive since the record does not establish that the wide distribution was made only to those inside the "narrow group who shared an interest in the communication."  See Draghetti v. Chmielewski, 626 N.E.2d 862, 867 (Mass. 1994).  Thus, considering the large number of recipients, a jury could find that Baitler published the e-mail excessively.

In this case, the presence of these three pieces of evidence support inferences upon which a jury could base a verdict for Noonan.  In this case, where "motive and intent play a leading role, summary judgment should not be granted" since Noonan presented evidence beyond conclusory allegations or mere speculation.  Barss v. Tosches, 785 F.2d 20, 22 (1st Cir. 1986) (affirming summary judgment as plaintiff rested on "the mere allegation of an illegal motive found in the complaint, and reiterated in an affidavit"); see also Aponte-Santiago v. López-Rivera, 957 F.2d 40, 41 (1st Cir. 1992) ("The summary judgment standard 'remains particularly rigorous when the disputed issue turns on a question of motive or intent.'" (quoting Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988))).  Of course, "after the full presentation of the evidence at trial, a factfinder might very well decide differently," but Noonan "has raised a genuine issue of material fact as to the actual reason" for publication of the e-mail, sufficient to defeat summary

-22-

judgment.  <u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 57 (1st Cir. 2000).

Staples also contends that a conditional privilege applies to protect Baitler's statements.  A privilege does protect statements "'reasonably related to the employer's legitimate business interest.'"  <u>Sklar</u> v. <u>Beth Israel Deaconess Med. Ctr.</u>, 797 N.E.2d 381, 388 (Mass. App. Ct. 2003) (quoting <u>Foley</u> v. <u>Polaroid Corp.</u>, 508 N.E.2d 72, 79 (Mass. 1987)).  But, this conditional privilege is also defeated by a showing of malice.  <u>Dragonas</u>, 833 N.E.2d at 687 (defining malice in this context to be a "base ulterior motive," and including "intention to injure another").  So, if the jury finds actual malice sufficient to defeat the statutory truth defense, the conditional privilege would also be vitiated.

### C.  Breach of Stock-Option Agreements

Noonan next argues that the district court erred in granting summary judgment to Staples on his claim that the latter breached the two stock-option agreements by not allowing him to exercise his options.  The district court noted the language in the agreements providing that Noonan was ineligible for the stock options if Staples determined that his termination was "for cause," and dismissed the claim because "Staples's classification of [Noonan's] actions as willful misconduct appears reasonable and applicable in the circumstances."

-23-

As an initial matter, we must ascertain the correct rubric through which to evaluate Noonan's assertion that he did not, in fact, engage in willful misconduct or any other activity that would qualify as cause for his firing. Staples contends that we are prohibited from reaching the merits of this question, as the stock-option agreements entrust the decision on what constitutes "cause" to Staples, and Staples alone. It argues that several courts have held similar clauses to be a valid limitation on contractual remedies. See, e.g., McIntyre v. Phila. Suburban Corp., 90 F. Supp. 2d 596, 600 (E.D. Pa. 2000); Stemerman v. Ackerman, 184 A.2d 28, 33 (Del. Ch. 1962). Noonan, by contrast, urges us to declare the relevant clauses in the agreements invalid because they violate public policy, because they allow Staples to be the judge in its own case. See, e.g., Ellis v. Emhart Mfg. Co., 191 A.2d 546, 549 (Conn. 1963) (clause in stock-option agreement violated public policy by providing that board of directors' interpretation was final and conclusive) (citing, inter alia, Patton v. Babson's Statistical Org., Inc., 156 N.E. 534, 536 (Mass. 1927)). Noonan invites us instead to engage in de novo review of whether there was cause to fire him. For the reasons explained below, the weight of authority pushes us onto a middle course between these two extremes.

The question we must answer is whether Staples's contractual prerogative to determine what constitutes "cause" is

-24-

unreviewable. If so, the matter ends there and we need not look at the evidence to determine whether cause did indeed exist for firing Noonan, because Staples undisputably determined that it did. Unlike the inquiry into an alleged libel's truth or falsity discussed above -- which Massachusetts courts have addressed -- our survey of Massachusetts law reveals no pronouncement by that state's courts on this precise question. Since this case rests on diversity jurisdiction, we must attempt to divine how the Massachusetts courts, and in particular the Supreme Judicial Court, would answer the question if faced squarely with it. See Hardy v. Loon Mt. Recreation Corp., 276 F.3d 18, 20 (1st Cir. 2002); accord Liberty Mutual, 260 F.3d at 65 ("Absent a decision by the state's highest court, we are free to make our own best guess as to Massachusetts law . . . ."). In coming up with our "best guess," we may look to analogous decisions from other jurisdictions. Hardy, 276 F.3d at 20 (citing Stratford Sch. Dist., S.A.U. #58 v. Employers Reins. Corp., 162 F.3d 718, 720 (1st Cir. 1998)); see also Vigortone AG Prods., Inc. v. PM AG Prods., Inc., 316 F.3d 641, 644 (7th Cir. 2002) (explaining that "the best guess is that the state's highest court, should it ever be presented with the issues, will line up with the majority of the states"). We may also find guidance in pronouncements on similar matters by Massachusetts courts.

-25-

Staples points us to what is probably the most closely analogous published case of the handful that exist dealing with this question, Weir v. Anaconda Co., 773 F.2d 1073 (10th Cir. 1985). In that case, Weir and his former employer, the Anaconda Company, had a stock-option plan which gave an Anaconda compensation committee the sole authority to determine whether Weir had been fired for cause, and was thereby precluded from exercising a stock option. Contrary to Staples's suggestion, however, the Tenth Circuit did not hold that the compensation committee's cause decision was unreviewable. Id. at 1078. Instead, according to that court's reading of the applicable Kansas law, the committee's decision should be treated in a manner similar to an agency decision, and thus reviewed for whether it was arbitrary, fraudulent, or made in bad faith. Id. at 1078-79. After evaluating the evidence relating to Weir's firing in the light most favorable to him, the court concluded that the committee's decision suffered from none of these defects, and affirmed summary judgment in favor of Anaconda. See id. at 1081-83. Importantly, the court expressly rejected Weir's request that it apply, as Noonan implores us to do here, a fully de novo standard of review to the committee's decision. Id. at 1078.

Our survey of other jurisdictions has uncovered several cases adopting similar standards of review. See, e.g., Scribner v. Worldcom, Inc., 249 F.3d 902, 909 (9th Cir. 2001) (applying

-26-

Washington law, court reviews stock-option committee's interpretation of plan's terms to determine whether it was made in good faith); Craig v. Pillsbury Non-Qualified Pension Plan, 458 F.3d 748, 752 (8th Cir. 2006) (similar); W.R. Berkley Corp. v. Hall, No. Civ.A. 03C-12-146WCC, 2005 WL 406348, at *4 (Del. Super. Ct. Feb. 16, 2005) (unpublished) (when stock-option committee is vested with final authority to determine rights under plan, court will not second-guess its decision absent showing of fraud or bad faith); Schwartz v. Century Circuit, Inc., 163 A.2d 793, 796 (Del. Ch. 1960) (similar). These standards, and that propounded by the Weir court, comport with the standard consistently used by Massachusetts courts for determining whether a government official acted properly in discharging another government employee. See, e.g., Flomenbaum v. Commonwealth, 889 N.E.2d 423, 429 (Mass. 2008) (arbitrary or capricious); Levy v. Acting Governor, 767 N.E.2d 66, 79 (Mass. 2002); McSweeney v. Town Manager of Lexington, 401 N.E.2d 113, 117 (Mass. 1980); cf., e.g., Madera v. Marsh USA, Inc., 426 F.3d 56, 63-64 (1st Cir. 2005) (where ERISA benefits plan gives plan administrator or fiduciary discretionary authority to determine employee's eligibility for benefits, the determination is subject to an arbitrary and capricious standard of review, and the decision must be upheld "'if there is any reasonable basis for it'" (quoting Brigham v. Sun Life of Can., 317 F.3d 72, 81 (1st Cir. 2003)).

In view of this authority, our best prediction is that the Massachusetts Supreme Judicial Court would hold that Staples's "for cause" decision is not unreviewable, nor reviewable de novo,[13] but instead that the courts may perform a limited review of the decision to determine if it was arbitrary, capricious, or made in bad faith.[14]  Even if we might disagree with Staples's action regarding Noonan's firing, if Staples's decision was not arbitrary, capricious, or made in bad faith, then we must accord it deference, and consequently affirm the denial of Noonan's stock options under the plain terms of the agreements.  Cf., e.g., Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (courts are not "super personnel departments," and should not ordinarily second-guess employers' business decisions).  In performing this portion of the inquiry, we adopt the definition of "cause" common to both stock-

---

[13]  Noonan claims that we are bound by the Patton case, in which the Supreme Judicial Court held invalid a contractual clause giving a company president the sole authority to determine whether a fired employee would receive a deferred salary.  See Patton, 156 N.E. at 536.  Yet Massachusetts courts strongly favor the freedom of contract absent serious misconduct or fraud.  See, e.g., Sound Techniques, Inc. v. Hoffman, 737 N.E.2d 920, 927 (Mass. App. Ct. 2000).  There is no evidence in the record that Noonan, a sophisticated party, was under duress when he signed onto the stock-option agreements, or that the agreements suffered from some other infirmity invalidating their plain terms.  In any event, Patton dates from 1927, and we do not think the Court would take the same view today when faced with a modern stock-option agreement like the two at issue here.

[14]  At another point in its brief, Staples concedes that its cause decision must have been made in good faith, and that we have the authority to review the decision at least to that extent.

option agreements -- willful misconduct or willful failure to perform responsibilities in the best interests of Staples -- a definition which Noonan seems to accept as applicable here. Cf. DiPietro v. Sipex Corp., 865 N.E.2d 1190, 1194 n.3 (Mass. App. Ct. 2007) (applying definition of "for cause" as set forth in the relevant agreement).

Noonan argues that, while he undoubtedly committed a number of errors on the expense reports audited by Staples's investigation team, these were merely the result of inadvertence or carelessness, and not a willful attempt to defraud Staples. At the very least, Noonan contends, the determination of whether his conduct was willful involves looking into his state of mind, a question ordinarily reserved for the jury. See Maimaron v. Commonwealth, 865 N.E.2d 1098, 1109 (Mass. 2007). Again, however, our task here -- and the jury's, if this claim were to survive summary judgment -- is not to determine whether Noonan did indeed act willfully, but whether Staples's assessment that he acted willfully was arbitrary, capricious, or made in bad faith. Notwithstanding a viewing of the evidence in Noonan's favor, we hold that there is no material fact in dispute on this issue.

Noonan does not dispute that the team of investigators was competent and experienced. The team looked at not just one or two of his expense reports, but at thirty-seven, spread across 2005. It uncovered dozens of instances in which Noonan claimed

more than he was entitled to and determined unanimously that the discrepancies must have been intentional. Our review of the record reveals no material dispute of this fact. Even if, in fact, the dozens of discrepancies were all the result of some extreme sloppiness or inattentiveness on Noonan's part (as he rather unblushingly contends), we discern no triable issue of fact on whether the team -- and the Staples officers who reviewed and acted upon the team's findings -- had a good-faith basis for concluding that Noonan deliberately doctored these entries. For example, even taking Noonan's $1,100 Big Mac as an honest keypadding slip (as Noonan claims it was), the several entries showing the item claimed as exactly $100 more than it actually cost are extremely damaging to Noonan's case. The record reveals that the team found these to refute his claim that the discrepancies were merely instances in which he pre-populated the expense report (that is, he guessed at how much the item would cost) and simply forgot to go back and correct the entry later after he bought it and knew how much it actually cost. Also damaging to Noonan's case, and taken into account by the team, was his failure to notice (and his inability to explain this failure to the investigators) the large amounts of extra money being deposited into his account as a result of his over-reimbursements.[15]

---

[15] Another relevant factor is that Staples's termination letter to Noonan told him that he was being fired for cause. See Hammond v. T.J. Litle & Co., 82 F.3d 1166, 1175 (1st Cir. 1996) (applying

Therefore, regardless of whether Noonan also made errors that, in the end, resulted in an ultimate windfall for Staples,[16] the evidence viewed in Noonan's favor still shows highly suspicious expense-reporting practices sufficient to ground a finding that Noonan intentionally manipulated at least some expense reports so that he would receive money he did not deserve. As Noonan repeatedly argues or intimates, Staples may have been wiser to conduct yet another, even more searching investigation into his conduct; to give him a second chance before firing him; to impose some less-severe form of discipline; or to punish other violators in the North American Division -- of whom Noonan claims there were many -- with the same harsh penalty. Nevertheless, even indulging Noonan all reasonable inferences, we cannot say that Staples's decision that Noonan engaged in willful misconduct or willfully failed to perform his duties in its best interest -- based as it was on the findings of experienced auditors -- was arbitrary, capricious, or made in bad faith.

For these reasons, there is no triable issue of material fact with respect to Staples's decision that cause existed to fire

Massachusetts law and remarking that "when an employee may only be terminated for cause, whether the employer so informs the employee plays a decisive role in a court's later determination of whether the employee was discharged for cause").

[16] As noted above, the parties vigorously dispute which party received the ultimate windfall. We need not determine who is correct on this question in order to resolve the issues presented in this appeal. See supra note 3.

-31-

Noonan, and under the plain terms of the stock-option agreements, Staples was thus entitled to determine Noonan ineligible for the stock options. Accordingly, the district court did not err in granting summary judgment to Staples on Noonan's claims concerning the stock-option agreements, and we move on to his last ground of appeal.

### D. Breach of Severance Agreement

Lastly, Noonan contends that the district court erred in granting summary judgment to Staples on his claim that it violated the severance agreement. We need not dwell long on this ground of appeal because it is foreclosed by the plain terms of the relevant instruments. The severance agreement provided that Noonan would not receive his severance benefits if Staples terminated him "for '[c]ause.'" Another clause in the agreement provided that "cause," for purposes of the severance agreement, includes a violation of Staples's Code of Ethics. The Code of Ethics, in turn, contained the following provision:

> We expect you to keep accurate records and reports . . . . All company books, records, and accounts must be maintained in accordance with all applicable regulations and standards and accurately reflect the transactions they record. . . . We do not permit . . . false or misleading entries in the company's books or records for any reason. . . .

Even viewed in the light most favorable to Noonan, the evidence in the record readily shows that he failed to abide by

this clause of the Code of Ethics.[17]  As Staples suggests, even if all of Noonan's many expense-reporting discrepancies were simply careless mistakes or instances where he forgot to amend pre-populated entries after figuring out what the item actually cost, the mere fact that he deliberately created inaccurate entries through the practice of pre-population transgresses this provision. Thus, under the plain terms of the severance agreement, Noonan was fired for cause, as that term is specifically defined in that agreement.  See, e.g., Cabot Corp. v. AVX Corp., 863 N.E.2d 503, 513 (Mass. 2007) (where a contract's language is unambiguous, its interpretation is a question of law that may be resolved on summary judgment); Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1263 (Mass. 2007) (courts interpret contracts according to plain terms where these are unambiguous).  The district court therefore acted properly in determining that Noonan forfeited his entitlement to severance benefits, and summary judgment in favor of Staples on this claim must stand.[18]

---

[17]  The quoted language comes from the 2005 version of the Code of Ethics.  Noonan seems to argue that he was bound by the 2001 version of the Code; Staples asserts that he was bound by the 2005 version.  We need not decide which party is correct, as the relevant language in the 2001 version is identical.

[18]  We add that the 2004 Stock-Option Agreement (but not the 1992 Stock-Option Agreement) also included violation of the Code of Ethics as a ground constituting "cause."  Summary judgment in favor of Staples with respect to that agreement could therefore have been affirmed for this reason as an alternative to the ground discussed above.

### III.  <u>Conclusion</u>

For the foregoing reasons, we <u>affirm</u> the district court's grant of summary judgment in favor of Staples as to all counts except Count I, the defamation count.  As to this count, we reverse and remand Noonan's claim for trial.

**<u>Affirmed in part, Reversed in part, and Remanded</u>**.

No costs awarded.